MIDWAY MFG. CO., an Illinois
corporation, Plaintiff-Appellee,

v.

ARTIC INTERNATIONAL, INC., a New
Jersey corporation,
Defendant-Appellant.

No. 82–1607.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 29, 1982.

Decided April 11, 1983.

Richard G. Kinney, Chicago, Ill., for defendant-appellant.

Eric C. Cohen, Fitch, Even, Tabin, Flannery & Welsh, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and SWYGERT, Senior Circuit Judge.

CUMMINGS, Chief Judge.

This appeal involves questions regarding the scope of protection video games enjoy under the 1976 Copyright Act, 90 Stat. 2541, 17 U.S.C. § 101 *et seq.*

Plaintiff manufactures video game machines. Inside these machines are printed circuit boards capable of causing images to appear on a television picture screen and sounds to emanate from a speaker when an electric current is passed through them. On the outside of each machine are a picture screen, sound speaker, and a lever or button that allows a person using the machine to alter the images appearing on the machine's picture screen and the sounds emanating from its speaker. Each machine can produce a large number of related images and sounds. These sounds and images are stored on the machine's circuit boards—how the circuits are arranged and connected determines the set of sounds and images the machine is capable of making. When a person touches the control lever or button on the outside of the machine he sends a signal to the circuit boards inside the machine which causes them to retrieve and display one of the sounds and images stored in them. Playing a video game involves manipulating the controls on the machine so that some of the images stored in the machine's circuitry appear on its picture screen and some of its sounds emanate from its speaker.

Defendant sells printed circuit boards for use inside video game machines. One of the circuit boards defendant sells speeds up the rate of play—how fast the sounds and images change—of "Galaxian," one of plaintiff's video games, when inserted in place of one of the "Galaxian" machine's circuit boards. Another of defendant's circuit boards stores a set of images and sounds almost identical to that stored in the

circuit boards of plaintiff's "Pac-Man" video game machine[1] so that the video game people play on machines containing defendant's circuit board looks and sounds virtually the same as plaintiff's "Pac-Man" game.

Plaintiff sued defendant alleging that defendant's sale of these two circuit boards infringes its copyrights in its "Galaxian" and "Pac-Man" video games. In a memorandum opinion and order reported at 547 F.Supp. 999 (N.D.Ill.1982), the district court granted plaintiff's motion for a preliminary injunction and denied defendant's motion for summary judgment. The district court's order enjoins defendant from manufacturing or distributing circuit boards that can be used to play video games substantially similar to those protected by plaintiff's copyrights. Defendant appeals from that order on the ground that plaintiff has not shown a likelihood of succeeding on the merits of its claim of copyright infringement. We affirm for the reasons that follow.

■ Plaintiff claims that its "Pac-Man" and "Galaxian" video games are "audiovisual works" protected under the 1976 Copyright Act. Section 101 of that Act defines audiovisual works as

> works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied. 17 U.S.C. § 101.

It is not immediately obvious that video games fall within this definition. The phrase "series of related images" might be construed to refer only to a set of images displayed in a fixed sequence. Construed that way, video games do not qualify as audiovisual works. Each time a video game is played, a different sequence of images appears on the screen of the video game machine—assuming the game is not played exactly the same way each time. But the phrase might also be construed more broadly to refer to any set of images displayed as some kind of unit. That is how we construed it in *WGN Continental Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622 (7th Cir.1982), where we held that a news program and a thematically related textual display ("teletext") transmitted on the same television signal but broadcast on different television channels constituted a single audiovisual work. We see no reason to construe it more narrowly here. As we noted there, the legislative history of the Copyright Act of 1976 suggests that "Congress probably wanted the courts to interpret the definitional provisions of the new act flexibly, so that it would cover new technologies as they appeared, rather than to interpret those provisions narrowly and so force Congress periodically to update the act." 693 F.2d at 627.

There is a second difficulty that must be overcome if video games are to be classified as audiovisual works. Strictly speaking, the particular sequence of images that appears on the screen of a video game machine when the game is played is not the same work as the set of images stored in the machine's circuit boards. The person playing the game can vary the order in which the stored images appear on the screen by moving the machine's control lever. That makes playing a video game a little like arranging words in a dictionary into sentences or paints on a palette into a painting. The question is whether the creative effort in playing a video game is enough like writing or painting to make each performance of a video game the work of the player and not the game's inventor.

■ We think it is not. Television viewers may vary the order of images transmitted on the same signal but broadcast on different channels by pressing a button that changes the channel on their television. In the *WGN* case, we held that the creative effort required to do that did not make the sequence of images appearing on a viewer's

---

**1.** ·We described the "Pac-Man" video game in some detail in *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 610, 611 (7th Cir.1982).

television screen the work of the viewer and not of the television station that transmitted the images. Playing a video game is more like changing channels on a television than it is like writing a novel or painting a picture. The player of a video game does not have control over the sequence of images that appears on the video game screen. He cannot create any sequence he wants out of the images stored on the game's circuit boards. The most he can do is choose one of the limited number of sequences the game allows him to choose. He is unlike a writer or a painter because the video game in effect writes the sentences and paints the painting for him; he merely chooses one of the sentences stored in its memory, one of the paintings stored in its collection.

■ Defendant suggests another reason why plaintiff's video games are not copyrightable—because the printed circuit boards in which the games are fixed are patentable. We reject this argument for the same reason District Judge Decker rejected it. See 547 F.Supp. at 1008–1009. Plaintiff claims copyrights in audiovisual works—the distinctive set of images and sounds stored in its circuit boards. It does not claim copyrights in the design of those circuit boards, so it matters not that those designs may be patentable. Recording images and sounds in circuit boards does not destroy their copyrightability any more than does recording them on rolls of celluloid film. Defendant cites *Apple Computer, Inc. v. Franklin Computer Corp.*, 545 F.Supp. 812 (E.D.Pa.1982), and *The Magnavox Co. v. Mattell, Inc.*, 216 U.S.P.Q. 28 (N.D.Ill.1982) in support of its argument, but those cases are easily distinguished. Both dealt with copyrights in computer programs, not with copyrights in audiovisual works fixed in computer programs. We thus conclude that video games are copyrightable as audiovisual works under the 1976 Copyright Act and we note that every other federal court (including our own) that has confronted this issue has reached the same conclusion. *Williams Electronics, Inc. v. Artic International, Inc.*, 685 F.2d 870 (3rd Cir.1982); *Atari, Inc. v. North Ameri-*

*can Philips Consumer Electronics Corp.*, 672 F.2d 607, 617 (7th Cir.1982); *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852 (2nd Cir.1982); *Midway Manufacturing Co. v. Dirkschneider*, 543 F.Supp. 466 (D.Neb. 1981). Cf. *WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622, 625–626 (7th Cir.1982).

Defendant next argues that plaintiff's copyrights are invalid because the 1976 Copyright Act does not apply to plaintiff's video games. Section 117 of the 1976 Copyright Act was amended in 1980 to define the exclusive rights of owners of copyrights in computer programs. As originally enacted, Section 117 provided that the 1909 Copyright Act and common law were to govern the rights of a copyright owner "with respect to the use of the [copyrighted] work in conjunction with" computers. Defendant argues that the 1980 amendment does not apply to copyrights, like those of plaintiff, in existence before the amendment took effect and that the original Section 117 requires that we look to the 1909 Act and common law to determine whether the circuit boards defendant manufactures are copies of plaintiff's audiovisual works.

■ We disagree. Even if the 1980 amendment applies only to copyrights issued after its effective date—an issue we do not decide—the district court properly applied the 1976 Act. The language and legislative history of the 1980 amendment are convincing that original Section 117 was intended only to leave unaltered the existing law governing the exclusive rights of owners of copyrights in computer programs. See H.Rep. No. 96–1307, 96th Cong., 2nd Sess. 27 (1980) (Part I) (Judiciary Committee), reprinted in 1980 U.S.Code Cong. & Ad.News 6460, 6486; *id.* at 19 (Part II) (Committee on Government Operations), reprinted in 1980 U.S.Code Cong. & Ad.News 6509; *Tandy Corp. v. Personal Micro Computers, Inc.*, 524 F.Supp. 171, 174–175 (N.D. Cal.1981). It was not intended to permit pirating of audiovisual works stored in computers.

■ Defendant also argues that even if plaintiff's video games are copyrightable, plaintiff's asserted copyrights are invalid because the works they protect were originally published without the notice of copyright required by Section 401 of the 1976 Act. Plaintiff purchased the copyrights it asserts in this suit in 1979 and early 1980 from a Japanese company that invented the video game machines plaintiff now markets. Defendant claims that the Japanese company published in Japan without notice of copyright the audiovisual works stored in these machines before it assigned its copyrights to plaintiff. Even if that is so, however, the copyrights plaintiff purchased from the Japanese company are valid. Plaintiff registered its works in the United States in May and November 1980 (Supp. App. 102, 110)—within five years of the date they were originally published in Japan. Section 405(a)(2) affords a copyright owner five years within which to remedy the omission of a copyright notice from published copies of a work. Defendant does not allege that plaintiff has omitted to put a notice of copyright on any of the machines plaintiff has distributed in the United States or that its alleged infringement of plaintiff's copyrights was in reliance upon the omission of such notice from those copies originally published in Japan.

The final argument of defendant's that we address is that selling plaintiff's licensees circuit boards that speed up the rate of play of plaintiff's video games is not an infringement of plaintiff's copyrights. Speeding up the rate of play of a video game is a little like playing at 45 or 78 revolutions per minute ("RPM's") a phonograph record recorded at 33 RPM's. If a discotheque licensee did that, it would probably not be an infringement of the record company's copyright in the record. One might argue by analogy that it is not a copyright infringement for video game licensees to speed up the rate of play of video games, and that it is not a contributory infringement for the defendant to sell licensees circuit boards that enable them to do that.

There is this critical difference between playing records at a faster than recorded speed and playing video games at a faster than manufactured rate: there is an enormous demand for speeded-up video games but there is little if any demand for speeded-up records. Not many people want to hear 33 RPM records played at 45 and 78 RPM's so that record licensors would not care if their licensees play them at that speed. But there is a big demand for speeded-up video games. Speeding up a video game's action makes the game more challenging and exciting and increases the licensee's revenue per game. Speeded-up games end sooner than normal games and consequently if players are willing to pay an additional price-per-minute in exchange for the challenge and excitement of a faster game, licensees will take in greater total revenues. Video game copyright owners would undoubtedly like to lay their hands on some of that extra revenue and therefore it cannot be assumed that licensees are implicitly authorized to use speeded-up circuit boards in the machines plaintiff supplies.

■ Among a copyright owner's exclusive rights is the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). If, as we hold, the speeded-up "Galaxian" game that a licensee creates with a circuit board supplied by the defendant is a derivative work based upon "Galaxian," a licensee who lacks the plaintiff's authorization to create a derivative work is a direct infringer and the defendant is a contributory infringer through its sale of the speeded-up circuit board. See, *e.g., Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971); *Universal City Studios, Inc. v. Sony Corp. of America,* 659 F.2d 963, 975 (9th Cir.1981), certiorari granted, 457 U.S. 1116, 102 S.Ct. 2926, 73 L.Ed.2d 1326 (1982).

■ Section 101 of the 1976 Copyright Act defines a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion pic-

ture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." It is not obvious from this language whether a speeded-up video game is a derivative work. A speeded-up phonograph record probably is not. Cf. *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 73 F.Supp. 165, 167 (S.D.N.Y. 1947) ("The change in time of the added chorus, and the slight variation in the base of the accompaniment, there being no change in the tune or lyrics, would not be 'new work' "); 1 Nimmer on Copyright § 3.03 (1982). But that is because the additional value to the copyright owner of having the right to market separately the speeded-up version of the recorded performance is too trivial to warrant legal protection for that right. A speeded-up video game is a substantially different product from the original game. As noted, it is more exciting to play and it requires some creative effort to produce. For that reason, the owner of the copyright on the game should be entitled to monopolize it on the same theory that he is entitled to monopolize the derivative works specifically listed in Section 101. The current rage for video games was not anticipated in 1976, and like any new technology the video game does not fit with complete ease the definition of derivative work in Section 101 of the 1976 Act. But the amount by which the language of Section 101 must be stretched to accommodate speeded-up video games is, we believe, within the limits within which Congress wanted the new Act to operate. Cf. *WGN Continental Broadcasting Co., supra*, 693 F.2d at 627; *Williams Electronics, Inc., supra*, 685 F.2d at 873–874; *Atari, supra*, 672 F.2d at 614–620.

Defendant raises other arguments on appeal, all of which we reject for the reasons set forth in District Judge Decker's exhaustive opinion. See 547 F.Supp. at 1005–1012.

AFFIRMED.