**WORLDS OF WONDER, INC., a California Corporation, Plaintiff,**

v.

**VERITEL LEARNING SYSTEMS, INC., and Christopher J. Daly, Defendants.**

**Civ. A. No. CA 3–86–1989–G.**

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 22, 1986.

Martin L. Lagod, Brown & Bain, Palo Alto, Cal., for plaintiff.

William C. Meier, Adams, Meier, Addison & Associates, Hurst, Tex., for defendants.

## MEMORANDUM ORDER

FISH, District Judge.

This case is before the court on the motion of plaintiff Worlds of Wonder, Inc. ("W.O.W.") for a preliminary injunction against defendants Veritel Learning Systems, Inc. ("Veritel") and Christopher J. Daly ("Daly"). Upon review of the motion, memoranda, affidavits and exhibits, the court is of the opinion that plaintiff's motion is meritorious. Consequently, for the reasons stated below, plaintiff's motion is granted.[1]

### I. Nature of the Case

Plaintiff W.O.W. brought suit against Veritel for copyright infringement, trademark infringement, and unfair competition in connection with Veritel's production of cassette tapes for a toy bear named Teddy Ruxpin. Teddy Ruxpin is the principal character in "The World of Teddy Ruxpin" product line marketed by W.O.W. When a specially designed tape is inserted into the back of Teddy Ruxpin, his eyes, nose and mouth move in synchronization with his voice as he sings and tells stories. The tapes used to achieve this life-like animation have two tracks: (1) an audio track for the voice and other sounds and (2) another track programmed with digital information transmitted to the electromechanical motors which move Teddy Ruxpin's eyes, nose and mouth.

"The World of Teddy Ruxpin" line includes Grubby, Teddy's best friend. Grubby can be connected to Teddy Ruxpin by a cable, and when a W.O.W. tape is played in Teddy Ruxpin, both characters are animated in synchronization with their voices. "The World of Teddy Ruxpin" also includes other non-animated plush toys. W.O.W.

Rod Phelan, David Godbey, Hughes & Luce, Dallas, Tex., Chris R. Ottenweller,

---

**1.** This memorandum order constitutes the court's findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P. That rule provides in pertinent part:

"... and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action."

and its licensor, Alchemy II ("Alchemy"), have developed 24 separate stories, each contained on a specially programmed tape. Six additional stories are now under development. Each story is designed to teach children lessons about friendship, love, integrity, and other aspects of life and growing up.

By any measure, Teddy Ruxpin and related toys have been a spectacular commercial success. Since their introduction last year, more than 1.5 million Teddy Ruxpin units have been sold. In its first fiscal year, net sales on the entire "World of Teddy Ruxpin" product line exceeded $90 million. Teddy Ruxpin has consistently been ranked as one of the top ten toys in the country. W.O.W. has granted merchandise licenses to 25 companies for such products as lunch boxes, children's apparel, books, towels, and linens. The popularity of Teddy Ruxpin is further evidenced by the fact that he has starred in two network television specials and will be featured in a series of 65 half-hour television episodes.

W.O.W. has obtained registered copyrights and trademarks for Teddy Ruxpin. A certificate of copyright registration, registration number PA 288–501, has been issued by the Register of Copyrights for the Teddy Ruxpin audiovisual work. Certificate of copyright registration number VA 171–809 covers Teddy Ruxpin as a plush toy. "Teddy Ruxpin" and "Animagic" are federally registered trademarks (registration numbers 1,344,800 and 1,359,397, respectively). W.O.W. is the exclusive licensee under all Teddy Ruxpin copyrights and trademarks. A confirmatory license agreement has been filed and recorded with the Copyright Office reflecting W.O.W.'s status as the exclusive licensee.

Veritel manufactures and offers for sale specially designed cassette tapes which animate Teddy Ruxpin. W.O.W. alleges that the audiovisual work created when a Veritel tape is used in Teddy Ruxpin is substantially similar to the Teddy Ruxpin audiovisual work. As a result, W.O.W. charges, the Veritel tapes alter Teddy Ruxpin's character by taking him out of the "World of Teddy Ruxpin." W.O.W. further maintains that the animation command track of the Veritel tapes contains a large quantity of high frequency distortion, which can cause a loss of synchronization or overdriving of the electromechanical motors. According to W.O.W., this phenomenon produces excessive wear on the motors, which in turn can lead to shortened battery life and premature product failure. W.O.W. is concerned that consumers are likely to blame problems arising from the use of Veritel tapes on W.O.W., thus irreparably damaging the commercial value of Teddy Ruxpin.

To prevent such irreparable damage, W.O.W. seeks to enjoin Veritel and Daly from manufacturing, selling, offering for sale, or otherwise distributing cassette tapes that, it contends, infringe the copyrights and trademarks on Teddy Ruxpin and injure its reputation and goodwill.

## II. *Analysis*

### A. *The Legal Standard*

To obtain a preliminary injunction, it is well established that a movant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the non-movant; and (4) granting the injunction is not adverse to the public interest. *Boyd v. Roland,* 789 F.2d 347, 349 (5th Cir.1986); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985); *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 114 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

The decision to grant or deny a preliminary injunction is left to the sound discretion of the district court. A preliminary injunction is a extraordinary remedy which should only be granted if the movant has carried his burden of persuasion on all four of the factors described above. *Mississippi Power & Light,* above, 760 F.2d at 621.

This court concludes that W.O.W. has satisfied its burden on each of the four factors.[2]

## B. *Substantial Likelihood of Success on the Merits*

Holders of copyrights possess the following exclusive rights:

(1) to reproduce the copyrighted work in copies ...;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies ... of the copyrighted work to the public by sale ...;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomines, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomines, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C. § 106.

W.O.W. is the exclusive licensee of all rights under the Teddy Ruxpin copyright, as evidenced by the confirmatory license agreement between W.O.W. and Alchemy recorded with the copyright office. Plaintiff's Exhibit 1. Thus, W.O.W. has the right to bring suit for infringement of the copyright under 17 U.S.C. § 501(b).

Veritel's principal contention is that the copyright covering Teddy Ruxpin as an audiovisual work is invalid. It maintains that since that copyright is invalid, there can be no infringement. The statute, 17 U.S.C. § 101, defines audiovisual works as follows:

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

Veritel contends that to satisfy this definition, the item in question must be an original work of authorship, fixed in a tangible medium of expression, and consist of a series of related images capable of being shown by a machine or device.

The Copyright Office has issued a certificate of registration for Teddy Ruxpin as an audiovisual work. Plaintiff's Exhibit 3. Under 17 U.S.C. § 410(c), the certificate of registration constitutes *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. *See American International Pictures, Inc. v. Foreman,* 576 F.2d 661, 665 (5th Cir.1978).

Veritel has the burden of overcoming the presumption of validity of the copyright and the facts stated therein. *Williams Electronics, Inc. v. Artic International, Inc.,* 685 F.2d 870, 873 (3d Cir.1982); *Flick-Reedy Corporation v. Hydro-Line Manufacturing Company,* 351 F.2d 546, 549 (7th Cir.1965), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966); *Midway Mfg. Co. v. Artic International, Inc.,* 547 F.Supp. 999, 1007 (N.D.Ill.1982), *aff'd,* 704 F.2d 1009 (7th Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983).

---

**2.** The court made this determination without an evidentiary hearing on the basis of the motion and supporting memoranda, affidavits and exhibits. On September 12, 1986, defendants filed a motion for an evidentiary hearing, which the court hereby denies. In support of their position, defendants cited *Medeco Security Locks, Inc. v. Swiderek,* 680 F.2d 37 (7th Cir.1981); they failed to explain, however, why *Medeco* requires a hearing under the circumstances here. *Medeco* held that a hearing is required where there are "highly contested" credibility or fact issues. 680 F.2d 39. As provided in its order of July 30, 1986, this court is willing to hold such a hearing, if the affidavits and depositions filed by W.O.W. or Veritel indicate any conflicts to be resolved or credibility determinations to be made. A review of the affidavits and depositions in this record discloses no such conflicts. A hearing is therefore unnecessary. *See* Rule 43(e), Fed.R.Civ.P. (authorizing pretrial motions to be decided on the basis of affidavits or depositions); *Miller Brewing Company v. Fort Worth Distributing Company,* 781 F.2d 494, 496 (5th Cir.1986) (finding no fault with determination, under Rule 43(e), of motion for preliminary injunction without an evidentiary hearing). *See also United States v. McGee,* 714 F.2d 607, 613 (6th Cir.1983); *Socialist Workers Party v. Illinois State Board of Elections,* 566 F.2d 586, 587 (7th Cir.1977), *aff'd,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979).

Veritel has failed to overcome the presumption of validity of certificate of registration number PA 288–501 classifying Teddy Ruxpin as an "audiovisual work comprising animated plush toy bear with unique voice." Indeed, Veritel has done little more than recite the statutory definition of an audiovisual work and state that Teddy Ruxpin does not fall within it.

This court is persuaded that Teddy Ruxpin is properly classified as an audiovisual work. Teddy Ruxpin produces a "series of related images" in the form of life-like animation activated by the specially designed cassette tape. The images are accompanied by sounds in the form of Teddy's voice, the voices of other characters, and music. The term audiovisual work should be broadly construed "to refer to any set of images displayed as some kind of unit." *Midway Mfg. Co.*, 704 F.2d at 1011. Such a flexible approach seems consistent with the legislative history of the present Copyright Act, because it enables the courts to deal with new technologies or new adaptations of technologies, rather than forcing Congress to periodically update the act because of an overly rigid interpretation of its provisions. *Id., citing WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622, 627 (7th Cir.1982).

To prove infringement, the party claiming infringement must show substantial similarity. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). W.O.W. contends that when a Veritel tape is played in Teddy Ruxpin, it produces an audiovisual work substantially similar to the W.O.W. audiovisual work.

A work is substantially similar to another if an average lay observer would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression. *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). *See also Silverman v. CBS, Inc.*, 632 F.Supp. 1344, 1351–52 (S.D.N.Y.1986). In applying this test, the court must compare the "total concept" of the two works, not minute differences detected by analytic dissection. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation*, 562 F.2d 1157, 1166–1167 (9th Cir. 1977). Where children are involved, this test of the average observer becomes even more intrinsic. *Id.* at 1166.

This court finds that the W.O.W. tapes and the Veritel tapes are substantially similar, particularly in view of the fact that the audience for the tapes consists of children. The voice and animation of the tapes are similar. The total concept and feel of the works is substantially similar. There is some difference in the voices on the tapes, but it is unlikely that the ordinary observer (particularly when that ordinary observer is a child) would detect the difference. While there is some difference in the story line, this difference is not significant enough to alter the basic conclusion that, under the totality of circumstances, the W.O.W. tapes and the Veritel tapes are substantially similar.

This case is analogous to *Midway Mfg. Co.*, above, 547 F.Supp. at 999. In that case, Midway sued Artic alleging that the latter's "speed-up kits" were derivative works [3] which violated Midway's exclusive right under the Copyright Act. The speed up kits could be inserted into Midway's "Galaxian" video games. The kits were plugged into the main memory board of the machine causing the "aliens" portrayed on

---

**3.** A derivative work is a work based on one or more preexisting works which may be recast, transformed or adapted. 17 U.S.C. § 101. A leading treatise writer has explained this definition as follows:

A work is not derivative unless it has *substantially* copied from a prior work.... [A] work will be considered a derivative work only if it would be considered an infringing work if the material which it has derived from a preexist-

ing work had been taken without the consent of a copyright proprietor of such preexisting work.

(Emphasis in original). 1 Nimmer on Copyright § 3.01 (1986), *cited in Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985); *United States v. Taxe*, 540 F.2d 961, 965 n. 2 (9th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977).

the screen to move faster and drop more bombs on the player's ship. The district court held that the modifications of the copyrighted display fit "well within the definition of derivative works." *Midway Mfg. Co.*, 547 F.Supp. at 1014.

■ In this case, the Veritel cassette inserted into Teddy Ruxpin creates a substantially similar audiovisual work which is altered in much the same as a Galaxian game is altered by a speed up kit. Thus, the modification of the copyrighted Teddy Ruxpin toy also falls within the definition of derivative works.

The court in *Midway Mfg. Co.* was also persuaded by the fact that the kit was designed solely to modify the Galaxian game. This court is convinced that the Veritel tapes were designed to be used solely with Teddy Ruxpin. Defendants have admitted that they conceived the idea of producing the tapes to capitalize on the success of Teddy Ruxpin. Arnstein Dep. Tr. 16–17; Emmick Dep. Tr. 22–23; Baer Dep. Tr. 35; Daly Dep. Tr. 106–107, 109. Robert Arnstein, who was responsible for Veritel's animation programming, had a Teddy Ruxpin in front of him while he programmed the Veritel tapes. Daly Dep. Tr. 112. Marc Emmick, the actor who provided the voice for the Veritel tapes, admitted listening to a Teddy Ruxpin tape. Emmick Dep. Tr. 21, 28; Daly Dep. Tr. 118. There is no evidence that the tapes may be used in any other animated toy. Although the tape may be played in a standard cassette player, the command track which controls Teddy Ruxpin's movements then becomes superfluous. Clearly, the Veritel tapes were designed exclusively for use in Teddy Ruxpin.

In sum, defendants have failed to overcome the presumption of the validity of plaintiff's copyright. In addition, the evidence indicates that Veritel's tapes are derivative works which are substantially similar to W.O.W.'s tapes. Consequently, the

court concludes that W.O.W. has demonstrated a substantial likelihood of success on the merits of its copyright infringement claim. In light of this conclusion, it is unnecessary to consider W.O.W.'s likelihood of success on its trademark infringement and unfair competition claims.

### C. *Irreparable Harm*

A showing of a reasonable likelihood of success on the merits of a copyright infringement claim raises a presumption of irreparable harm. *Apple Computer, Inc. v. Franklin Computer Corporation*, 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Entertainment & Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.*, 623 F.Supp. 647, 656 (S.D.Tex.1985). Because W.O.W. has shown a reasonable likelihood of success on the merits of its copyright infringement claim, the court finds that it is entitled to a presumption of irreparable harm. Although defendants deny that W.O.W. will suffer immediate and irreparable harm if the injunction is denied, they offer no evidence to substantiate that position.

Even without the benefit of this presumption, however, the court concludes that W.O.W. had demonstrated that it will suffer irreparable harm unless a preliminary injunction is granted. W.O.W. and Alchemy have invested millions of dollars to develop Teddy Ruxpin into a successful product. The World of Teddy Ruxpin has great commercial value in terms of sales of Teddy Ruxpin units, as well as the tapes, clothing and other plush toys associated with the line. In addition, sales of merchandise licenses are commercially valuable. Sales of the Veritel tapes undermine the carefully tailored image of Teddy Ruxpin developed by W.O.W. The court agrees with a recent decision by the United States District Court in the Northern District of Ohio, in a closely analogous case [4],

---

**4.** Defendants argue that *Worlds of Wonder v. Vector Intercontinental, Inc.* is not analogous to the case at bar because it involves different parties, different products, different presentations, and different issues. The court, however,

reaches a contrary conclusion. Like this case, *Vector Intercontinental* involves claims by W.O.W. for copyright infringement, trademark infringement, and unfair competition against a manufacturer of tapes for Teddy Ruxpin. It is

that the popularity of the Teddy Ruxpin product is jeopardized when tapes altering the image of Teddy Ruxpin are played. It would be impossible to compute the diminution in commercial value of Teddy Ruxpin; thus, W.O.W. will suffer irreparable damage if a preliminary injunction is not granted. *Worlds of Wonder, Inc. v. Vector Intercontinental, Inc. and New Age Communication Center, Inc.*, 653 F.Supp. 135, 140–141 (N.D.Ohio 1986).

### D. *Balance of Hardships*

W.O.W. has invested millions of dollars in the development of the "World of Teddy Ruxpin." By the end of 1986, W.O.W. will have invested an estimated $20 million on advertising alone. By contrast, the evidence indicates that Veritel's investment has been only a tiny fraction of that amount. As stated earlier, net sales on the Teddy Ruxpin product line exceeded $90 million in the first year. Revenues from future sales of products in the line coupled with merchandise licenses and television rights can be conservatively estimated to be well in excess of the $90 million. Thus, W.O.W. stands to lose far greater sums if the preliminary injunction is not granted than Veritel stands to lose if it is enjoined from distributing tapes pending the resolution of this suit.

Veritel contends that it will be "put out of business" if a preliminary injunction is granted. Veritel alleges that it lost a potential individual investor and that a Maryland bank cancelled a line of credit after this court's temporary restraining order was issued. While a preliminary injunction would no doubt have some adverse financial impact on Veritel, defendants have not produced evidence indicating that it will be rendered insolvent if the injunction is issued. In fact, the evidence indicates that Veritel is either producing or planning to produce a number of products unrelated to Teddy Ruxpin, including three home videotapes, at least two audiotapes and a series of products for Coleco. Daly Dep. Tr. 179.

Even if Veritel could establish, however, that the injunction would have a devastating effect on its business, the court does not believe that this factor would be sufficient to deny preliminary injunctive relief. As the Third Circuit has stated:

> If that were the correct standard, then a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone.

*Apple Computer*, 714 F.2d at 1255. *See also Helene Curtis Industries v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1333 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978), *quoting My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir.1934). If Veritel has chosen to base its business on copyright infringement, it cannot prevent the issuance of an injunction by alleging that enforcement of W.O.W.'s copyright will seriously impact its business.

### E. *The Public Interest*

Defendants contend that granting injunctive relief here will disserve the public interest, but they fail to come forward with any evidence of an adverse effect. This court concludes that an injunction will not disserve the public interest. On the contrary, the injunction will serve the public interest by preserving the integrity of copyright laws which encourage individual effort and creativity by granting valuable enforceable rights. *Atari*, 672 F.2d at 620; *Worlds of Wonder, Inc. v. Vector Intercontinental, Inc. and New Age Communication Center, Inc.*, 653 F.Supp at 141.

### III. *Conclusion*

This court concludes that W.O.W.'s motion for a preliminary injunction should be GRANTED to the following extent: Until further order of this court, defendant Veritel, its officers, employees, agents and attorneys, including defendant Daly, and all persons in active concert with them, will be restrained from shipping, distributing, selling or otherwise placing in commerce cassette tapes which activate the Teddy Rux-

---

true, as defendants assert, that the defendants in *Vector Intercontinental* did not contest the validity of W.O.W.'s copyright. This difference does

not, however, outweigh the many factual similarities between the two cases.

pin animation system, or purport to do so, or which contain a voice confusingly similar to the Teddy Ruxpin voice. This restraint does not extend to Veritel's manufacture of its cassette tapes. If W.O.W. is ultimately successful in this case, however, Veritel and Daly may be permanently enjoined from selling or otherwise using any tapes they may produce.

SO ORDERED.