DSC COMMUNICATIONS
CORP., Plaintiff,

v.

DGI TECHNOLOGIES, INC., Defendant.

No. 3:94–CV–1047.

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 1, 1995.

1184

Robert William Kantner, Eric Nevins Whitney, Baker & Botts, Dallas, TX, for DSC Communications Corporation.

David Hugh Judson, Stephen Granberry Gleboff, Hughes & Luce, Dallas, TX, Aubrey Dale Pittman, Johnson & Wortley, Dallas, TX, for DGI Technologies, Inc.

Richard D. Mays, Law Office of Richard Mays, Anna, TX, pro se.

Robert William Kantner, Baker & Botts, Dallas, TX, for DSC Communications Corporation.

## *MEMORANDUM OPINION AND ORDER*

KENDALL, District Judge.

Now before the Court are DSC Communications Corporation's Motion for a Preliminary Injunction and Supporting Memorandum and DGI's Motion to Vacate the Seizure Order, for Return of Wrongfully Seized Property, and for Forfeiture of the Bond, and Brief in Support. Both parties filed their respective responses and replies to both motions. Having considered these filed materials, as well as the arguments of counsel and evidence adduced at the July 24 and July 25, 1995 hearing, the Court hereby **GRANTS in PART** and **DENIES in PART** both the Motion for a Preliminary Injunction and the Motion to Vacate the Seizure Order.

### Background

Plaintiff DSC Communications Corporation ("DSC") asserts several claims against Defendant DGI Technologies, Inc. ("DGI") which involve DGI's alleged wrongful copying or misappropriation of various software, firmware, DSC manuals and schematic diagrams. DSC alleges copyright infringement, trade secret misappropriation, unfair competition and Lanham Act violations.

Earlier this year, on April 28th, DSC counsel and the U.S. Marshals executed an ex parte seizure order at DGI's premises. The seizure order was granted based upon DSC's allegations of copyright violations by DGI and DGI's surreptitious downloading of DSC's software at one of DSC's customer sites.

DSC and DGI's dispute centers around the network of microprocessors and cards that DSC and DGI manufacture in order to control particular tasks in digital switching systems common in the telecommunications industry. The subject of the instant motions is the most recent upgrade in the microprocessor family, the MP–8, and the DSC software necessary to allow the MP–8 to function.

The hearing focused on three separate issues which this Order will address in turn. The first issue is whether DGI's "disassembly" and "reverse engineering" of the firmware from the DSC MP–8 card violated the Copyright Act, 17 U.S.C. § 106 and whether DGI should be enjoined from further disassembly and reverse engineering. The next issue is whether DGI's visits to the customer site to download copies of the operating system software located at that site also constituted copyright infringement and that an injunction should issue to prohibit further similar action. The third and final issue, is whether all of the actions DGI took were in the course of research, study and reverse engineering. Therefore, DGI seeks denial of any injunctive relief against them and also seeks to vacate the original seizure order.

## I.

### Findings of Fact on the Firmware Issue [1]

DSC is a Delaware Corporation with its principal place of business in Plano, Texas. DSC designs, manufactures and markets digital switching, transmission, access and private network system products for the worldwide communications network.

DGI is a Texas Corporation with its principal place of business in Richardson. DGI

produces and markets products which are compatible with DSC systems.

DSC and DGI manufacture a family of products designed to control and to facilitate certain tasks in the telecommunications industry. These products include digital switching systems, microprocessor cards and other hardware. The microprocessors are placed on circuit boards, referred to as cards. The cards are inserted into digital interface modules, commonly called shelves. Finally, the shelves are placed in digital trunk frames. This system allows DSC and DGI customers to perform telecommunications tasks and service the needs of both the long distance and local phone customers. The most recent upgrade in the cards is the MP–8.

MP–8s are available for sale on the open market. The cards may be purchased from DSC directly, from one of its customers or on the surplus or used market. Each MP–8 contains firmware imbedded on a computer chip located on the card itself. Firmware is software which is imbedded in the computer chip. Firmware cannot be modified by the user or owner of the card.

DGI purchased a number of MP–8 cards on the open market. DGI purchased the card to study in order to develop a microprocessor card which would be compatible with DSC digital trunk frames and operating software.

Jay Gentry is an independent contractor who works at DGI. Gentry's primary function is to develop firmware for use in the DGI version of the MP–8. Gentry, in the course of developing DGI's firmware, developed a disassembly program in order to disassemble or translate, into human readable form, the DSC firmware retrieved from the DSC MP–8 card. Disassembling a program consists of translating the firmware code, or instructions, from machine readable object code to human (at least computer programmer) readable form.

Gentry has disassembled a program named CPBOOT and the firmware located on the

---

**1.** To the extent any conclusion of law is construed as a finding of fact, or vice-versa, any such finding or conclusion is so deemed.

Programmable Read Only Memory (PROM) chip on the DSC MP–8. After the disassembly was complete, Gentry provided the disassembled code to another DGI engineer, John Sanders, who drafted a flowchart of the firmware. Gentry used this flowchart and the disassembled DSC code to begin drafting the DGI firmware. Gentry's initial draft of the DGI firmware was prepared January 10, 1995. Gentry has continued to working on successive drafts throughout 1995 and continues to work on subsequent drafts of the firmware to this date.

The DSC firmware and the DGI firmware were compared by each party's expert witness. Based upon the agreement of both experts, the Court finds that the DSC firmware and the DGI firmware are not substantially similar.

DGI disassembled DSC's firmware for a commercial purpose. DGI wanted to discover the functionalities and ideas expressed in the DSC firmware, in order to create their own firmware for use on a compatible microprocessor.

## Conclusions of Law on the Firmware Issue

■ To obtain injunctive relief, Plaintiff must satisfy four stringent criteria: (a) that they are substantially likely to succeed on the merits of their claims, (b) that the Court's failure to issue the injunction poses a substantial threat of irreparable injury, (c) that the threatened injury outweighs any damage that the injunction's issuance might cause to the opposing party, and (d) that the injunction's issuance will not undermine the public interest. *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir.1989). All four of these elements are mixed questions of law and fact. *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989). Each of these factors must be considered to determine whether, on balance, they collectively favor granting the injunction. *Picker International, Inc. v. Blanton,* 756 F.Supp. 971 (N.D.Tex.1990) *citing Calvin Klein Cosmetics Corp. v. Lenox Laboratories,* 815 F.2d 500, 503 (8th Cir.1987). A preliminary injunction should issue only if the movant has clearly carried the burden of persuasion regarding all four factors. *Allied Mktg. Group,* 878 F.2d at 809. A district court's determination of a preliminary injunction motion will be reversed only if the court abuses its discretion. *Blue Bell Bio–Medical,* 864 F.2d at 1256. In the abuse of discretion analysis, the court's fact findings will be overturned only if clearly erroneous. *Id.; Apple Barrel Prod., Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984).

### Likelihood of Success on the Merits

■ To prevail on its copyright infringement claim with regard to the firmware, DSC must establish (1) ownership of a valid copyright on the firmware, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295, 113 L.Ed.2d 358 (1991). To show ownership of a valid copyright and satisfy the first requirement of the test, DSC must prove that the work as a whole is original and that DSC has complied with the applicable statutory formalities. *Engineering Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1340 (5th Cir.1994).

■ In judicial proceedings, a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden of proof to the defendant to show why the copyright is not valid. *Lotus Development Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 812–13 (1st Cir.1995) *cert. filed* June 7, 1995; *see also* 17 U.S.C. § 410(c). DSC submitted into evidence at the hearing and has attached as exhibits to its Second Amended Original Complaint several copyright certificates. Among the certificates submitted, DSC included a Copyright Certificate on the MP–8 Processor Board Firmware. DSC has satisfied the first prong of showing ownership of a valid copyright on the firmware. DGI does not contest the validity of the copyright on the MP–8 firmware. Instead, DGI asserts other affirmative defenses which will be addressed later.

■■ A finding of actionable copying requires analysis of two separate components. *Engineering Dynamics,* 26 F.3d at 1340.

First, a factual question regarding whether the alleged infringer actually used the copyrighted material to create its own work must be answered. *Id.* Copying of as a factual matter typically may be inferred from proof of access and "probative similarity." *Id.* Not all copying is copyright infringement. *Id.*

 The second question that must be analyzed is whether the copying at issue is legally actionable. This question involves a comparative analysis of the two works at issue to determine whether they are substantially similar. *Id.* The initial comparison in this matter must be made between DSC's firmware and the DGI disassembled version of that firmware. DSC and DGI stipulate that these two programs are identical, indeed they must be identical for DGI to discover the functionality of the DSC firmware.

██ The Fifth Circuit has not addressed whether this type of disassembly of a computer program, or "intermediate copying," constitutes wrongful copying under this Circuit's Copyright Act jurisprudence. Since it is a matter of first impression in this jurisdiction, the Court looks to our sister Circuits for guidance. The Ninth Circuit addressed a situation similar to the one at bar in *Sega.* The Ninth Circuit held that the Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the copy represents. *Sega Enter. Ltd. v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir. 1992). The holding was based upon the language of 17 U.S.C. § 106 which provides owners of a copyrighted works the exclusive rights "to reproduce the copyrighted work in copies," "to prepare derivative works based upon the copyrighted work," and "to authorize the preparation of derivative works or copies." 17 U.S.C. § 106(1), (2). Based upon the language of the Copyright Act and the definition of a copy [2], the Ninth Circuit held that intermediate copying falls squarely within the category of acts prohibited by the Act. *Id.* at 1518. This Court wholeheartedly agrees. Since a valid copyright has been

shown and the DSC firmware and the DGI disassembled firmware are virtually identical, copyright infringement has occurred unless DGI can prove an affirmative defense which excuses their disassembling or intermediate copying of the DSC firmware.

 Having determined that DGI's intermediate disassembled copies are "copies" under the Copyright Act, the Court now analyzes DGI's affirmative defense of fair use, i.e. whether DGI's disassembly project constitutes fair use under 17 U.S.C. § 107. Section 107 provides:

> [T]he fair use of a copyrighted work, including such use by *reproduction in copies* or ... by any other means specified by [section 106], for purposes such as criticism, comment ... scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

These statutory factors are not exclusive. Rather, the doctrine of fair use is in essence an equitable rule of reason. *Sega,* 977 F.2d at 1521, *citations omitted.* Since fair use is an equitable doctrine, the Court finds that the manner in which DGI obtained its disassembled firmware is relevant. DGI purchased its own DSC MP–8 card to study and to analyze both the hardware specifications and the firmware present in the MP–8 computer chip. DGI wrote the disassembler program and modified it when it did not disassemble the firmware satisfactorily.

**2.** A "copy" *must be fixed in some tangible form,* "from which the work can be perceived, reproduced, or otherwise communicated, either direct-

ly or with the aid of a machine or device." *Sega* at 1518 *citing* 17 U.S.C. § 101.

■ The Copyright Act does not protect ideas, procedures, processes, systems, methods of operation, concepts, principles or discoveries, regardless of the form in which it is described, explained, illustrated, or embodied in such work. 17 U.S.C. § 101. With regard to the ideas, procedures, processes, systems, methods of operation or concepts which may be embodied in a computer program, the fact that these unprotected items are usually found in object code precludes examining the unprotected portions of the program. Like the scenario in *Sega*, the only means of gaining access to the unprotected aspects of DSC's firmware was through the program's disassembly. DGI has a legitimate interest in gaining access to the unprotected aspects of the firmware in order to create a compatible MP–8 microprocessor with which it could compete with DSC in the marketplace. Therefore, in accordance with the Ninth Circuit's reasoning in *Sega*, this Court holds that when good reason exists for studying or examining the unprotected aspects of a copyrighted program, disassembly for the purpose of study or examination of the disassembled program constitutes fair use. *Sega*, 977 F.2d at 1520.

In analyzing DGI's § 107 defense, the statutory factors, weigh in favor of holding DGI's disassembly of DSC's firmware to be a fair use. Analyzing the affirmative defense of fair use is not to be simplified with bright-line rules. The statute, like the doctrine it recognizes, calls for a case-by-case analysis. *Campbell v. Acuff–Rose Music, Inc.*, — U.S. —, —, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994). In conducting this case-by-case analysis, the Court may not treat the four factors in isolation. Instead, all of the factors are to be explored, and the results weighed together, in light of the purposes of the Copyright Act. *Id.* at —, 114 S.Ct. at 1171.

The first factor to be considered in a fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). DSC maintains that since DGI's intermediate copying is for a commercial use, i.e. analyzing the functionality of the firmware to create a compatible microprocessor, the use is presumptively not fair. (DSC's Resp. to DGI's Bench Memos at 7). However, the commercial nature of DGI's disassembly cannot be given dispositive weight. *Campbell* at —, 114 S.Ct. at 1174. Indeed, if "commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107...." *Id.* The case DSC relies upon, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), did not call for a "hard evidentiary presumption." *Campbell*, — U.S. at —, 114 S.Ct. at 1174. Instead, the Supreme Court emphasized a need for a sensitive balancing of interests and noted that Congress eschewed a rigid, bright-line approach to fair use. *Id.* The commercial purpose of the copying is simply a factor to be weighed along with the other factors in the fair use analysis.

■ Like the situation in *Sega*, the copy at issue in this case was an intermediate one and any commercial exploitation of the disassembled copy was indirect or derivative. Credible testimony at the hearing indicated that the disassembly was done to discover the functional and unprotected aspects of the DSC MP–8 firmware. Gentry indicated that a flowchart was created based upon the disassembly and that he used this flowchart in conjunction with the disassembled firmware to draft the DGI version of the firmware.[3]

---

**3.** DSC makes much ado of DGI's failure, or inability according to which side is arguing, to use a "clean room." A "clean room" is a technique used in the software industry to prevent the direct copying of a competitor's code during the development of a competing product. The procedure usually consists of two teams of developers, one team disassembles the code and describes its functional aspects, while the other team takes the descriptions of the functional aspects and writes the competing product's code.

Ideally, this process represents the optimal way to develop a competing product because the alleged infringer can demonstrate that the programmer who drafted the competing code had no access to the original copyrighted work. By showing no access the alleged infringer could defeat the first requirement of a copyright infringement action and thereby end both the analysis and the case. However, the test of copyright infringement has two requirements, access and substantial similarity. So while, DSC may suc-

These facts and the record indicate that DGI's ultimate direct use of the copyrighted firmware was to study the functional requirements of the firmware so that DGI could manufacture a compatible card.

■ The second statutory factor considers the nature of the copyrighted work and acknowledges the fact that not all copyrighted works enjoy the same level of protection. For instance, works of pure creative expression such as songs or poems or novels come closer to the core of intended copyright protection than works containing primarily factual elements such as biographies, historical essays or almanacs. The Copyright Act does not protect the factual or functional aspects of a copyrighted work and a work's functional or factual aspects may be copied without offending the Copyright Act.

Unfortunately, computer programs do not fit neatly into either category of protected work. While there are certainly creative aspects within any particular program, there are also those functional aspects necessary to perform the given task which will not enjoy copyright protection. *See Lotus Development Corp. v. Borland Int'l,* 49 F.3d 807 (1st Cir.1995); *see also Engineering Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335 (5th Cir.1995); *see also Computer Assoc. Intl, Inc. v. Altai, Inc.,* 982 F.2d 693 (2nd Cir.1992). Due to the hybrid nature of computer programs, a single test for determining what constitutes protected expression and what constitutes the ideas, processes or methods of operation in the program has been slow to develop. However, the Fifth Circuit recently adopted a process formulated by the Tenth Circuit for determining the scope of copyright protection for computer programs. *Engineering Dynamics* at 1342.

This method of separating the protected from the unprotected in computer programs is referred to as the "abstraction-filtration-comparison" method ("the A–F–C method"). *Id.* at 1343. This method is a three-step analysis which may be applied to any given computer program. First, the program should be dissected according to its varying levels of generality as provided in the abstractions test developed by Judge Learned Hand. *Id.* Next, at the filtration stage, the court should examine each level of abstraction and "filter" out those elements of the program which are unprotectable. This step should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, scenes á faire material, and other unprotectable elements suggested by the particular facts of the program under examination. *Id.* Finally, the court should compare the remaining protectable elements with the allegedly infringing program and determine whether the Defendant misappropriated substantial elements of the plaintiff's program.

Absent the agreement of the experts and counsel for the parties, the Court would use the A–F–C method to analyze DSC's firmware and DGI's version of the firmware. However, the parties have agreed that the two versions are not substantially similar. What is important at this point in this Court's analysis is that the A–F–C method necessarily entails that the program to be analyzed must be in a form that allows the court to distinguish between the expressive content and the functional content. In some cases, the functional content may be easily separated from the expressive content without resorting to the basic code level. In others, like the instant case, there is no way to discern between protected and unprotected elements of a program without examining the program's code.

The record establishes that the only way to understand the functional elements of DSC's firmware was to disassemble the object code on the chip. The firmware is only distributed to purchasers and users of the MP–8 in object code. The functions that the MP–8 code performs in the trunk processors are not visible or readily discernible to the user during the MP–8's operation. Without disassembling the program there is no way to tell what is protected expression and what is an

ceed in proving access because DGI is not using the preferred "clean room" method of development, DSC must still prove substantial similarity between its firmware and the DGI firmware. A standard which DSC counsel, DSC's expert, DGI's counsel and DGI's expert all agree and stipulate DSC cannot satisfy.

unprotected idea or process. "If disassembly of copyrighted object code is per se an unfair use, the owner of the copyright gains a de facto monopoly over the functional aspects of his works—aspects that were expressly denied copyright protection by Congress." *Sega*, 977 F.2d at 1525. In order to enjoy a lawful monopoly over the idea or functional principle underlying the work, the creator must satisfy the more stringent standards imposed by patent law. *Id. citations omitted.* DSC does not hold any patents on the MP–8 firmware or hardware.

Because DSC's firmware has functional aspects that cannot be examined without copying, the Court affords the firmware a lower degree of protection than more traditional literary or musical works. *See Sega Enter. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir.1992).

■ The third statutory factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," weighs against DGI in this matter. DGI has disassembled the DSC firmware in its entirety several times. However, the fact that an entire work was copied does not preclude a finding of fair use. *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 449–50, 104 S.Ct. 774, 791–92, 78 L.Ed.2d 574 (1984).

Finally the fourth factor, and perhaps the most important, "the effect of the use on the potential market for or value of the copyrighted work," necessitates that the court inquire whether the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work[4]. *Id.* at 451, 104 S.Ct. at 792. Testimony at the injunction hearing indicated that DGI's planned version of the MP–8 will not perform the same functions as DSC's MP–8. DGI engineers, DGI's president, and DGI counsel indicated that the only projected function of DGI's MP–8 firmware will be to boot up and to enable the other hardware to function. DSC counsel argued, "[t]hat code [DGI's firmware] will not even perform the boot-up function that they want to perform. And we believe they won't be able to sell a

[MP–8] card that does nothing but boot up. For example … if something goes wrong [with the board] DSC can diagnose certain problems on the board without ever going to a customer site. What they [DGI] are saying is that they can sell a board to a customer that doesn't allow the customer to do that. We have real questions about whether that's going to be marketable or not, but I guess that remains to be seen." (Transcript, July 25, 1995 at 78, 11. 5–16). DSC does not believe DGI's completed version of the MP–8 will be of interest to prospective. telecommunications consumers due to its lack of diagnostic, maintenance and serial port communications functions. If, and when, the DGI MP–8 version is completed the only function it will perform is the boot-up function. Based upon the evidence, there does not appear to be any fear that the stripped-down DGI model will interfere with the marketability or unduly usurp the market of the super deluxe DSC MP–8 model.

In sum, three of the four factors of DGI's fair use affirmative defense, weigh in favor of DGI. The third factor weighs against DGI because the entire DSC firmware has been disassembled. However, disassembly of the entire program to discover its functional aspects was necessitated by the nature of the computer program. Considering the factors as a group, the Court finds that DGI's disassembly was fair use. Allowing a computer programmer to hide his ideas, processes and concepts in copyrighted object code defeats the fundamental purpose of the Copyright Act—to encourage the creation of original works by protecting the creator's expression while leaving the ideas, facts and functional concepts in the free marketplace to be built upon by others.

■ Having found that DGI's intermediate copying of DSC's firmware was a fair use, the Court must now decide whether the DGI version of MP–8 firmware is a violation of DSC's copyright on the MP–8 processor firmware. After hearing the testimony of both parties' expert witnesses and in light of the stipulation of counsel, the Court holds

---

**4.** If the challenged use would diminish potential sales, interfere with marketability or usurp the market, this factor may outweigh all other considerations. *Sega* at 1523.

that the current version of the DGI firmware is not substantially similar to DSC's firmware. Because DSC has not shown substantial similarity between its copyrighted firmware and DGI's firmware, the Court cannot find that they are substantially likely to succeed on the merits. Therefore, DSC is not entitled to a preliminary injunction on the firmware issue.

## II.

### Findings of Fact on the Operating System Software Issue

DSC provides its customers with DSC operating system software in order to allow the digital switching products e.g., digital trunk frames and cards, to function properly. DSC has spent millions of dollars and a large number of man-years developing their operating system software. DSC developed and modified its operating system software over a fifteen year period.

DSC licenses its operating software to the vast majority of its customers. These customers do not own the software which is necessary for the functioning of the digital trunk frames and cards. The only exception to this policy noted in the hearing was Motorola. Motorola and DSC have a research agreement which allows Motorola to obtain ownership of the software for developmental purposes. The operating system software is not available commercially on the open market. The operating system and a license to that software can only be obtained from DSC. The operating system software can only be found in two locations, at DSC customer sites and at DSC.

NTS Communications Corporation is a customer of DSC. NTS owns digital trunk frames and various microprocessor cards manufactured by DSC. NTS licenses operating system software from DSC to run the hardware it owns. DSC and NTS have executed a licensing agreement which controls the relationship between them. The agreement also defines NTS' rights and responsibilities with regard to the licensed software. The licensing agreement prohibits NTS from reproducing or copying the software in whole or in part. NTS is also prohibited from providing, disclosing, or making the software or any portions of the software available to any person except to its employees without the prior written consent of DSC.

NTS is also a customer of DGI. Mike Tucker and Gary Sams of NTS, vice president and director of networks, respectively, agreed to provide DGI employees access to the DSC equipment NTS owned in order for DGI to test various products at the Dallas NTS location. Lyle Coffman, president of DGI, agreed to give NTS a ten percent discount off of any DGI equipment purchased in exchange for this access. One of the products tested at the NTS Dallas location was DGI's version of the MP–8 card. Jay Gentry, an agent of DGI, during visits to NTS between December 1994 and March of 1995, downloaded copies of DSC's operating system software programs. DGI needed this software. Using a microprocessor card and a laptop computer, Gentry stored copies of the software and took them back to DGI's premises. This was done by Gentry upon instruction by DGI management. NTS management and executives were not informed and had no idea that DGI was copying DSC's operating software in the process of testing the DGI version of the MP–8. Indeed, DGI did not ask; they merely took.

None of DGI's executives, engineers or employees, despite their years of experience in the telecommunications and software development industries, attempted to find out what was in NTS's licensing agreement. Indeed, none of these individuals attempted to find out if such an agreement existed. The Court finds that they did not care.

Licensing software instead of transferring ownership is common throughout the telecommunications and the software industry for the specific purpose, as here, of protecting one's investment in research and development from piracy. A prohibition against copying or allowing a third party to copy licensed software is common the software industry, for the same reasons.

DGI was not a party to the licensing agreement between NTS and DSC. However, the Court may reasonably infer form the evidence that DGI, through its executives, managers or engineers knew such an agree-

ment existed between NTS and DSC. Additionally, it is a reasonable inference that DGI, through its executives, managers or engineers knew that a prohibition against copying or allowing third parties to copy the software was a provision in such an agreement.

This Court has no desire to be harsh or vitriolic, but believes that it should speak plainly and not mince words. The Court believes that a reasonable inference to be drawn from the evidence is that DGI knew some type of licensing agreement existed, that it would prohibit a third-party competitor such as DGI from accessing or copying the software, and that if they asked permission (of either DSC or NTS) to access or copy the software, they would be told "no." The Court so finds and also finds that because DGI was, and is, in financial trouble they were, as DGI's president Lyle Coffman testified, "Desperate." The Court finds that they simply took the software without DSC's or NTS' knowledge or consent in their desperate effort to stay afloat and to compete.

## Conclusions of Law on the Software Issue

DSC asserts a copyright infringement claim against DGI for DGI's copying of the operating system that DGI downloaded and took back to DGI's premises. DSC's request for injunctive relief and its claim for copyright infringement of the operating system software involve the identical questions of law addressed in the firmware section of this Order. Therefore, the Court adopts those preceding Conclusions of Law applicable to this claim of copyright infringement by reference. In addition, DSC has submitted and offered into evidence Copyright Registration Certificates on the following operating system programs:

DSC OCC EX Program
DEBUGM
KR Program
OSC OCC ED Program
DSC OCC OS Program
EKOSM
CPBoot Operating System Source Code

OS Megahub Source Code
DB Operating System Source Code
KR Operating System Source Code
EX Megahub Source Code
ED Megahub Source Code
EKOSM
DEBUGM
AUTPRM

### Likelihood of Success on the Merits

DSC has satisfied the first prong of the test by presenting prima facie evidence of copyrightability in the form of copyright certificates for the operating systems at issue. DGI does not dispute the validity of these copyrights on the operating system software programs; rather DGI asserts affirmative defenses of fair use and copyright misuse which will be addressed below.

Initially, a comparison must be made between DSC's operating systems software and the operating system software DGI downloaded at DSC's NTS customer site. DSC's expert, Robert Nimon, who drafted a large part of the DSC operating system software, compared the software seized on April 28 to DSC's software and found that the programs seized are identical to DSC's operating system software. DGI agrees with this conclusion. Accordingly, since a valid copyright has been shown and the DSC software and the DGI copies are identical, copyright infringement has occurred unless DGI can prove an affirmative defense which excuses their downloading and copying of DSC operating system.

■ As to DGI's assertion that its copying of the software constitutes fair use under 17 U.S.C. § 107[5], the Court again considers the manner in which DGI obtained the operating system software is relevant. DGI president, Lyle Coffman, entered into an agreement with two NTS executives, Gary Sams and Mike Tucker which allowed DGI engineers to test products in development at the NTS Dallas site. In exchange for this access, NTS would receive an additional ten percent reduction in the price of any products purchased from DGI. Under the guise

---

5. *See* p. 8 supra.

**1194**

of this agreement, DGI's Jay Gentry along with other DGI engineers tested a modified DSC MP–8 card, and without informing or consulting any NTS executive or manager, Gentry downloaded copies of DSC's operating software. In short, they took something that did not belong to them without the knowledge or permission of the owner. DGI's actions were discovered when a disgruntled ex-employee told on DGI, resulting in the ex parte seizure order which obtained the evidence before it could be destroyed.

Gentry and Coffman have both been employed in the telecommunications industry collectively for over forty years. Gentry was formerly employed by DSC. Yet, to excuse the program of wholesale copying that DGI and its engineers engaged in for several months, both men, with a straight face, assert that they did not know a licensing agreement existed or even contemplated the existence of a licensing agreement between NTS and DSC. The Court simply does not believe this testimony. This assertion is followed by another disingenuous statement that even if a licensing agreement existed, DGI was not a party to said agreement and, therefore, was at liberty to copy any and all software located on the DSC switch with impunity. The Court finds these assertions lacking any factual or legal basis. In short, the incredible reasons proffered to excuse DGI's wholesale copying of DSC's operating system software are insufficient to entitle DGI to assert a fair use defense.

In *Atari Games Corp. v. Nintendo of America,* the Federal Circuit addressed a factual scenario similar to the one at bar. 975 F.2d 832 (Fed.Cir.1992). In that case, Atari misrepresented the status of litigation pending between Atari and Nintendo to obtain a copy of Nintendo's copyrighted 10NES source code[6] from the Copyright Office. The Federal Circuit held Atari was not entitled to invoke the fair use exception, since an individual must be in possession of an authorized copy of the protected work in order to avail himself of this equitable defense. *Atari,* 975 F.2d at 843, *citing Harper & Row,*

*Publishers, Inc., v. Nation Enter.,* 471 U.S. 539, 562–63, 105 S.Ct. 2218, 2231–32, 85 L.Ed.2d 588 (1985) (Knowing exploitation of purloined manuscript not compatible with "good faith" and "fair dealing" underpinnings of fair use doctrine.).

DGI knowingly exploited an agreement for access to NTS' Dallas site in order to acquire, what they could not buy on the open market. By exceeding the scope of the initial agreement for testing between NTS and DGI, DGI engineers violated that agreement. By downloading copies of the operating system software that belonged to DSC, DGI not only violated the agreement between DGI and NTS, but also caused NTS to violate the licensing agreement with DSC. Because DGI was not authorized to possess the downloaded copies of DSC's operating system software, any copying, study or derivative copying by DGI of the operating system software does not qualify as fair use.

In sum, DSC, with regard to the operating system software, has shown both access to the copyrighted work and substantial similarity between the software and the downloaded copies. DSC has shown a substantial likelihood of success on the merits of a copyright violation of the operating system.

DGI also asserts an affirmative defense of copyright misuse by DSC. In conclusory fashion in a bench brief submitted at the hearing, DGI alleged that DSC has misused its copyrights on the operating system software and firmware in eight different ways. However, DGI submitted no evidence on these misuses beyond a listing of the alleged misdeeds.

The Fifth Circuit has been presented with a defense of copyright misuse on at least one occasion. In *Mitchell Bros. Film Group v. Cinema Adult Theater,* the court stated, "[i]n an appropriate case a misuse of the copyright statute that in some way subverts the purpose of the statute, the promotion of originality, might constitute a bar to judicial relief. 604 F.2d 852 (5th Cir.1979). The Fifth Cir-

---

**6.** The 10NES source code was a program designed by Nintendo to prevent the Nintendo game console system from accepting unauthorized game cartridges. In order to be compati-

ble with Nintendo game consoles, Atari had to develop a program which would perform the same function and allow the game console to recognize Atari games.

cuit went on to state hypothetically that if the copyright were procured by fraudulent misrepresentations of authorship to the Register of Copyrights, copyright misuse could be an appropriate defense. The Fifth Circuit also found it likely that the public monopoly extension rationale of the patent tie-in cases is applicable to copyright.

Unfortunately for DGI, these hypothetical situations provide little direction in this case and DGI's laundry list of accusations provides even less. No doubt a more fully developed affirmative defense supported by evidence will assist DGI at trial, even though it will not protect DGI from the entry of a preliminary injunction today.

### Substantial Threat of Irreparable Injury

■■■ As to the second requirement of the injunction test, DSC must show a threat of irreparable injury from DGI's unauthorized copying and use of the operating system software. DGI has admitted having copies of the operating system software and admitted how they obtained these copies; the Court has found that DGI's method was unauthorized.

These operating system software programs are an important part of DSC's business. If DGI continues to use this software, it will be gaining an unjust advantage, the advantage of using the time and expertise DSC expended developing the copyrighted material. DSC loses physical control of its software and its software copyright rights when an unlicensed user has a copy of that software. If the Court were to allow DGI to continue to possess these unauthorized copies, there is nothing to prevent DGI from disclosing the operating system software to other parties. Since DGI has not entered into a licensing agreement with DSC for the operating system software, DGI is not contractually prevented from disseminating these programs without the consent of DSC.

DSC has shown it will suffer irreparable harm if DGI is allowed to continue copying and downloading removable copies of DSC's software. Indeed, the type of behavior DGI has engaged in is the very type of use the Copyright Act is designed to prevent and the use of an injunction to prevent its continued occurrence is warranted.

### Balance of the Hardships

■■■ The third prong of the injunction test, whether the harm to the defendant (DGI) caused by issuing the injunction outweighs the harm to the plaintiff (DSC) caused by the status quo, also weighs in DSC's favor. Lyle Coffman, DGI's president, has testified that if DGI cannot develop a compatible MP–8 card, the company will be put out of business. The Court has previously held that DGI's development of the MP–8 firmware by disassembling is a legitimate fair use. Under the injunction which will issue, DGI will be allowed to continue its development program.

Coffman and DGI's attorneys have represented to the Court that DGI has no intention of selling operating system software. Coffman testified that DGI has other products and product lines it will continue to sell to customers. While the Court acknowledges that preventing DGI from analyzing and disassembling the software may cause some inconvenience to DGI in developing the compatible MP–8 card, this inconvenience cannot overcome the real threat to DSC caused by unauthorized copying of its software.

As other circuits have noted, if the correct standard for balancing the hardships were whether the infringer would be forced out of business, then a knowing infringer could construct its business around an infringing product and effectively prevent the legitimate copyright holder from obtaining relief or enforcing its rights. See Apple Computer, Inc. v. Franklin Computer corp., 714 F.2d 1240 (3d Cir.1983) cert. dismissed, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). That is clearly not the result intended by the Copyright Act or the preliminary injunction standard. DGI cannot successfully maintain that unless it is allowed to continue unauthorized copying it will go out of business and expect this Court to prevent DSC from enforcing its rights based only upon that representation.

*Public Interest*

 The Court finds as a matter of law that the injunction would serve the public interest by preserving the integrity of copyright laws which encourage individual effort and creativity by granting valuable enforceable rights. *See Worlds of Wonder, Inc. v. Veritel Learning Systems, Inc.*, 658 F.Supp. 351, 357 (N.D.Tex.1986). The Court finds that the behavior engaged in by DGI on this issue is behavior that is to be condemned and discouraged.

## III.

### Findings of Fact on the Motion to Vacate the Seizure Order

At the April 28, 1995, seizure, the U.S. Marshals and DSC Counsel seized copies of DSC software, copies of disassembled DSC firmware and various pieces of hardware, including a test DGI MP–8 card. The disks seized from DGI's premises contained a set of DSC's operating software. The programs in the seized set included operating system software, configuration system software, diagnostic systems software and maintenance software.

DGI owned, at the time of its incorporation, a used MP–2 generation digital line switching trunk frame. Included with this switch were various manuals concerning the switch and the microprocessors used to operate the switch. The manuals contain copyright notices which restrict the dissemination or copying of the information in the manuals.

### Conclusions of Law on the Motion to Vacate Seizure Order

The Court has held that DGI's firmware development and disassembly do not infringe upon DSC's copyright of the firmware present on the MP–8 card DGI purchased. Accordingly, the seizure order is **VACATED** as it relates to the firmware. The Court finds that DSC's application for the seizure of the firmware was based upon an unsettled question of law in the Fifth Circuit. The motion was not motivated by bad faith or other ill motive.

The Court has also found that DGI's unauthorized copying of the operating system software was an infringement on DSC's software copyright. Consequently, DGI is not entitled to vacate the Order as it relates to the operating system software.

 Finally, the modified DSC MP–8 board constitutes an "articles by means of which … copies … may be reproduced." 17 U.S.C. § 503(a). Since the modified card is clearly subject to seizure under the Copyright Act, DGI is not entitled to have the seizure order vacated as it relates to that card.

## IV.

### Conclusion

Having satisfied all of the prerequisites necessary to show itself entitled to injunctive relief on the issue of the operating system software, the Court finds that the Plaintiff is entitled, until further order of the Court and pending further hearing of this cause, to a preliminary injunction against the Defendant as set forth below so that Plaintiff's rights may be preserved and in order to prevent irreparable injury to the Plaintiff pending final judgment in this action.

The Defendant has shown itself entitled to a partial vacation of the seizure order. However, forfeiture of the bond will not be granted at this time. The motion to vacate seizure is granted in part as set out more fully below.

The Plaintiff has not shown itself entitled to issuance of a preliminary injunction with regard to the firmware. Accordingly, Plaintiff's application for relief on that issue is denied.

Accordingly,

**IT IS ORDERED, ADJUDGED AND DECREED,** that Defendant DGI Technologies, Inc. ("DGI"), and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with DGI who receive actual notice of this Order and its contents by personal service or otherwise are hereby **ENJOINED** from doing or authorizing, directly or indirectly, any of the following acts without the authority of the DSC, the copyright owner of

copyrights relating to DSC's operating system software:

(1) Copying or reproducing with the intent to remove such copies or reproductions, in whole or in part, any operating system software, located at any customer site, whose copyright, or any exclusive right under copyright is owned by DSC;

(2) Causing, inducing, or otherwise in any way initiating the downloading or copying of DSC's operating system software in order to obtain a copy on either a disk or a personal computer hard drive which may be removed from a customer site and transported to any other physical location by anyone with notice of this Order;

(3) Making, using, selling, renting, distributing, exchanging, lending or transferring to any person, except as ordered by the Court, unauthorized copies of any DSC operating system software whose copyright or any exclusive right under copyright is owned by DSC;

(4) Causing or inducing DSC's software licensees to violate the term of their software licenses with DSC, with regard to the downloading for the purposes of creating a copy of DSC operating system software capable of being removed from the customer location. For purposes of this Order downloading for the purpose of creating a removable copy includes utilizing a battery-backed up microprocessor card to store such operating systems software for a length of time. Downloading for the purpose of creating a removable copy also includes the transmission of operating systems software by use of a modem. Downloading for the purpose of creating a removable copy does not include downloading into dynamic RAM on a microprocessor or test microprocessor card which is incidental to the testing or operating of a compatible MP–8 card so long as the copy is not capable of being removed from the customer location and transported to any other location.

(5) Modifying any DSC microprocessor card for the purpose of copying or downloading with the intent to create a removable copy any of DSC's operating systems software.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Defendant shall delete from the hard drive of any personal or laptop computer over which it, its employees or agents exercise control, any copy or copies of DSC operating system software whether such copy is present in object or source code.

Defendant shall also turn over to the Plaintiff any copy or copies of DSC operating system software over which it, its employees or agents exercise control, which exist on floppy disk. Defendant shall also turn over to DSC any written or hard copies of DSC operating system software over which it, its employees or agents exercise control.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiff shall return to Defendant all copies of Defendant's test firmware or firmware which was seized during the April 28, 1995, U.S. Marshal seizure. Specifically, Plaintiff shall return the following seized firmware and related programs [7]:

Disk 4 with the exception of temp.txt, try1.dat and try1.txt

Disk 5 with the exception of jay.bak and jay.bin

Disk 7 with the exception of jay.zip and mp2.bin

Disk 8

Disk 9 with the exception of cpboot.asm, cpboot.hex, cpboot.1st, cpboot.1st, xmp2.asm and xmp2.bin

temp.txt, located on Disk 10

Disk 11 with the exception of cpboot.asm, jay10.bin, jay10.txt

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiff has failed to establish a substantial likelihood of success on the merits of the firmware issue. The Court, as well as the two compet-

---

**7.** In preparing the following list, the Court has relied upon the inventory of the seized materials which was created by DSC's expert. The list has been annotated with descriptions of each seized file or program by DGI counsel or a DGI employ-

ee. The list is not exclusive; if Plaintiff has reason to know or actually knows of other files or programs which contain firmware or related programs, this Order serves to compel the return of those programs as well.

ing experts, has found that DGI's firmware is not substantially similar to the disassembled firmware of DSC. The Court has also found that DGI's intermediate copying is protected by fair use. Accordingly, DSC's motion for a preliminary injunction with regard to the MP–8 firmware is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff shall post an injunction bond in cash or by a corporate surety qualifying under the Local Rules of the Court, in the sum of 50,000, for payment of such costs and damages as may be incurred by the Defendant in the event that the Defendant has been wrongfully enjoined. Such bond shall be filed with the Clerk of the Court immediately.

**IT IS FURTHER ORDERED** that pursuant to FED.R.CIV.P. 4(c), a copy of this Order and a copy of documents demonstrating the Court's approval of Plaintiff's injunction bond shall be served upon DGI or upon its attorneys of record by any person acting under the supervision of Plaintiff's attorneys, over the age of eighteen (18) years of age and not a party to this action no later than 10:00 a.m. on the day following the issuance of the injunction bond and the Court's approval of said bond, and the same is hereby deemed good and sufficient service. DGI's counsel shall make all affected parties aware of this Order and its contents. This Order becomes effective only after the injunction bond has been filed with the Clerk of the Court and after proper service has been made as defined in this paragraph.

**SO ORDERED.**